283 So.2d 85 (1973)
William H. WRIGHT, Jr.
v.
MARK C. SMITH & SONS et al.
Nos. 52351 and 52793.
Supreme Court of Louisiana.
June 11, 1973.
Rehearings Denied August 20, 1973.
*87 Deutsch, Kerrigan & Stiles, Marian Mayer Berkett, Shushan, Meyer, Jackson, McPherson & Herzog, Donald A. Meyer, New Orleans, for respondents.
Gary J. Rouse, Kavanaugh & Talley, Victor A. Sachse, Breazeale, Sachse & Wilson, Baton Rouge, for defendants-respondents in No. 52351; applicant in No. 52793.
Dale, Owen, Richardson, Taylor & Mathews, Daniel R. Atkinson, Baton Rouge, for plaintiff-applicant in No. 52351; intervenor-respondent in No. 52793.
DIXON, Justice.
This case arises out of a land development venture. After arrangements for financing had been made and the land purchased, the prime mover in the development, Bilwood Smith, died. This suit is to enforce building contracts executed in the initial stages of the planned development.
The plaintiff is an officer and shareholder in Beaurivage of Mandeville, Inc., which was the owner of the lands on which the buildings were to have been constructed. Defendants were the contractor, Mark C. Smith & Sons, the partners (or succession representatives of the partner) composing the contracting company, and American Employers Insurance Company, the bonding company. The City National Bank of Baton Rouge, which handled the interim financing, intervened against the contractor and bonding company.
There was judgment in the district court rejecting the demands of plaintiff, but granting judgment in favor of the bank and against the contractor and bonding company.
In the Court of Appeal the judgment rejecting plaintiff's demands was affirmed, and the judgment in favor of the bank was reversed, but, on rehearing, the judgment in favor of the bank and against the contractor was reinstated for failure to perfect timely the appeal. Wright v. Mark C. Smith & Sons et al., 264 So.2d 304.
We affirm.
Bilwood Smith arranged to purchase undeveloped tracts of land on the Tchefunche River in St. Tammany Parish. His object was to create a subdivision containing over four hundred fifty residential lots, a golf course with appropriate buildings and a tennis club.
With his father and brother, Bilwood Smith was a partner in a building and construction firm called Mark C. Smith & Sons. For the purpose of this development, Bilwood Smith formed a corporation, Beaurivage of Mandeville, Inc. Bilwood Smith became its president, owning 50% of its stock; William H. Wright, Jr., was its secretary-treasurer with 25% of the stock; Senator Russell B. Long owned the other 25% of the stock. Wright and Long did not pay for their stock, but were to assist in obtaining financing. William H. Wright, Jr. was a member of the board of directors of the City National Bank of Baton Rouge.
Arrangements were made for permanent financing of the project with Guaranty Bond and Finance Company, Inc. Interim financing arrangements were made with the City National Bank of Baton Rouge, participating with Chase Manhattan Bank of New York.
After interim financing arrangements had been made and commitments obtained for permanent financing the contracts which are the subject of this litigation were executed. The permanent financing was contingent upon making certain improvements *88 on the property, such as streets, utilities, golf course and clubhouses.
The land cost $1,239,583.54. To obtain this amount, and other sums for the development of the property, the contracts which form the basis of this litigation were executed on May 6, 1968. On that day, Beaurivage of Mandeville, Inc., by Bilwood Smith, president, executed a note for $2,100,000. The note was individually endorsed by Bilwood Smith, Mark C. Smith, Jr., Mark C. Smith, III, William H. Wright, Jr. and Russell B. Long. The note was secured by a mortgage on the land involved and by the pledge of a savings account of the maker, Beaurivage of Mandeville, Inc.
Simultaneously with the execution of the note and mortgage, there were executed building contracts. The "owner" in the building contracts was Beaurivage of Mandeville, Inc., represented by William H. Wright, Jr. The "contractor" was Mark C. Smith & Sons, a partnership composed of Mark C. Smith, Jr., Mark C. Smith, III and Bilwood Smith. American Employers Insurance Company bonded the contracts. Beaurivage of Mandeville, Inc. and City National Bank of Baton Rouge were named the obligees in the building and construction bonds.
After the execution of the contracts, Beaurivage of Mandeville, Inc., commissioned an engineer to develop plans and specifications for site improvements. On August 10, 1968, before the engineer's work could be completed, Bilwood Smith died.
In the year following the execution of the contracts, no substantial work was performed on the land or buildings involved. New engineering and architectural plans and specifications were developed during that year, and bids obtained which were far in excess of the funds available to Beaurivage for the development of the project.
Wright, acting on behalf of Beaurivage, made demand on Mark C. Smith & Sons to comply with the contracts of May 6, 1968. The contractor declined for the reason that the contracts did not "include a scope of the work with sufficient certainty that both you as owner and the undersigned as contractor" could determine the requirements of the contracts. The contractor stated that it would request the bonding company to return the premium paid, since there was no valid and enforceable contract between Beaurivage and the contractor.
In August of 1969 the bank foreclosed on its mortgage; on October 15, 1969 it bought in the property for $1,100,000. A deficiency judgment was obtained against Beaurivage (but not against any endorser on the note) on December 7, 1970. On December 15, 1969 the land was sold to Wright and Long for $1,448.766.54, the amount claimed by the bank in its foreclosure suit. On January 18, 1971 the bank intervened in the instant suit.
This suit was filed on August 7, 1969 by William H. Wright, Jr., as a stockholder of Beaurivage, against the contractor, the partners, the succession representative of Bilwood Smith, the bonding company and Beaurivage of Mandeville, Inc. After answers were filed, the same law firm which filed the original petition on behalf of William H. Wright, Jr. filed the petition of intervention on behalf of the bank.
The petition alleged the default by the contractor on the building contract; the obtaining of bids for the performance of the work; the fact that the low bid was more than $900,000 in excess of the $360,000 for the site improvements and more than $100,000 in excess of the contract for the renovation and additions to the golf clubhouse and the tennis clubhouse. The petition claimed that Beaurivage was entitled to a judgment in the amount of the difference between the contracts executed by Mark C. Smith & Sons and the low bid obtained for doing the work, $1,083.842.95.
The petition alleged that Bilwood Smith, a partner in the contracting firm and the *89 president of Beaurivage, was thoroughly familiar with the work to be performed under the building contracts. The contracts were attached to the petition, and in addition were described in the petition. The commitment for permanent financing by Guaranty Bond and Finance Company, Inc., including amendments made prior to the execution of the note and contracts on May 6, 1968, it was alleged, was dependent upon the completion of certain improvements on the property "according to detailed plans and specifications to be presented to and approved by Guaranty Bond and which plans and specifications are generally to be as indicated on a rough plat of subdivision attached to said commitment ..."
It is not alleged that the two building contracts contained plans and specifications, but that "Beaurivage through Bilwood Smith, its President and a Director, and Mark C. Smith, III, its Vice-President and a Director, were thoroughly familiar at all times pertinent hereto with the nature, amount, and scope of the constructions required, and this knowledge was also the knowledge of the partnership, Mark C. Smith & Sons, of which they were two of the three partners."
The obligation of the building contract for site improvements is reproduced below:

The record discloses that the only plans and specifications in existence at the time of the execution of the contracts was the document introduced as P-5, which was a preliminary plot plan dated April 5, 1968 showing the location and size of proposed lots, streets, golf course and marina for the subdivision. Certain of the streets have been lined with a green marking pen; others have not.
*90 The record shows that the contracts and bonds were prepared by the bank, or its attorneys, on forms furnished by the bank. There is no testimony in the record which explains "Gold Medallion Standards" referred to in the typewritten portion of the contract. There were no other plans and specifications in existence on the date of the contract.
The relevant portion of the other contract (P-6) is reproduced below:

The contract for the golf clubhouse and the racquet and swim club was supported by a preliminary proposal prepared by James D. Dodds, and drawings referred to in the testimony as "blueprints" (P-8).
Although the contract instrument only refers to two buildings, the proposal for renovation and construction described the renovation of one existing building for the golf club, the renovation of another existing building for a "swim and racket club," and the construction of a new building for a pro shop and locker rooms. The typed proposal prepared by Dodds contains some general comments, in which the plans are referred to as a "preliminary design," and "outline specifications" for the golf club and the racquet and swim club renovation, and the construction of the third building.
The "blueprints" introduced devote one-half of one page to the design of the pro shop and locker rooms. A front elevation, a side elevation, and a floor plan are depicted. For the "swim and racket club," there is one sheet devoted to the first floor and one sheet devoted to the second floor, each sheet showing the floor plan as it existed in the building, and the floor plan as it would be changed during the renovation.
There were likewise two sheets in the set of blueprints for the renovation of the *91 golf club, also depicting the floor plans of the first and second floors as they existed and as they would exist after the renovation.
On two other sheets in the group, the site plans of the improvements were depicted.
The judgment in the district court in favor of the intervenor bank and against Mark C. Smith & Sons and American Employers Insurance Company was for an amount equal to the deficiency judgment the bank had obtained against Beaurivage.
The trial court's reason for rejecting plaintiff's demands, apparently, was that Bilwood Smith was, in effect, both the owner and the contractor on the two contracts (since he was the president of Beaurivage and a partner in Mark C. Smith & Sons). The trial court found that although the parties believed that the work could be performed for the contract amount, that "there was never any intention as between those parties that these bonds would remain in effect and that the bonding company would be called upon to honor them." This finding is based, apparently, upon the evidence that Bilwood Smith in a conference with the representative of the bonding company, made it clear that Mark C. Smith & Sons did not intend to perform the work, and that Beaurivage knew this. The building construction contracts were merely a requirement of the bank handling the interim financing, since they were required by the Guaranty Bond and Finance Company, Inc., which had issued the commitment for the permanent financing and the "take out" agreement, upon which the bank depended for the payment of the $2,100,000.
All of the evidence in the record supports the conclusion that Bilwood Smith, for Mark C. Smith & Sons and Beaurivage, and the representative of the bonding company, did not consider that these contracts would be executed. The preliminary plot plan for the subdivision was the only supporting document for the contract to build the streets and install the utilities. The renovation contract was supported by elementary blueprints and a mere outline of specifications. No other plans and specifications existed at the time of the confection of the agreements. Mr. Gottlieb, the chairman of the board of directors of the bank, who actually handled the loan with Bilwood Smith, testified that he classified this loan as a personal loan (an "ordinary non-real estate loan" under 12 U.S.C. § 371) made primarily on the endorsement of Long and Wright.
The conclusion of the trial judge was correct as to the intentions of Beaurivage, Mark C. Smith & Sons and American Employers Insurance Company; and for this reason Beaurivage cannot recover from American Employers. However, because the rights of third parties are affected, the intention of these parties, not expressed in their written agreements, may not be conclusive as to others.
There is no evidence (except for the paucity of contractual provisions governing the work) that the bank was a party to the understanding that Beaurivage and Mark C. Smith & Sons would not perform the work, but would obtain other contractors to do the work, who, in turn, would supply new bonds, to be substituted for the American Employers Insurance Company bond.
The district court, nevertheless, rendered judgment in favor of the intervenor bank and against Mark C. Smith & Sons and American Employers Insurance Company in an amount equal to the deficiency judgment which the bank had obtained against Beaurivage in the foreclosure.
The American Employers Insurance Company filed a motion for a new trial which was overruled; then the American Employers Insurance Company took an appeal and filed its bond timely.
Mark C. Smith & Sons did not file a motion for a new trial. It filed a motion for a devolutive appeal on July 15, 1971. *92 (The judgment had been rendered on March 22, 1971; the motion and order for an appeal for Mark C. Smith & Sons recited that it appealed from the judgment of March 22 "and from the denial of the motion for a new trial orally handed down on May 3, 1971, ..." But, as noted, Mark C. Smith & Sons did not file a motion for a new trial).
Even if American Employers Insurance Company's motion for a new trial could avail Mark C. Smith & Sons and the partners, the judgment against them became final, because their appeal bond was not filed until August 9, 1971. C.C.P. 2087; Pan American Petroleum Corp. v. Cocreham, 251 La. 705, 206 So.2d 79; Orrell v. Southern Farm Bureau Casualty Insurance Co., 248 La. 576, 180 So.2d 710.
These recent cases perpetuate the theory in Louisiana that the appeal bond is an increment of jurisdiction in the appellate courts, whose jurisdiction over a case does not attach (C.C.P. 2088) until the timely filing of the appeal bond; since the matter is jurisdictional, it may not be inappropriate for the Court of Appeal to dismiss the appeal on rehearing (C.C.P. 2162) and the three day period of C.C.P. 2161 for filing a motion to dismiss the appeal is not applicable.
There are cases in which this court has permitted the successful appeal of one party cast in judgment to avail the other who did not appeal. Brashear v. Carlin, 19 La. 395 (1841) dismissed the appeal of a surety taken after the determination on the separate appeal by the principal that there was no liability under the bond. Fontenot v. Sun Oil Co., 257 La. 642, 243 So.2d 783 (1971) permitted the appeal of a mineral lessee to inure to the benefit of non-appealing overriding royalty owners in the face of a plea of res judicata by the party who obtained the judgment in the trial court.
Neither case can avail the Smiths. In Brashear v. Carlin both parties in the appeal were contending that there was no liability on the defendant; the appeal was timely; the appellee moved to dismiss the appeal because he was of the opinion that no liability attached to the surety since there was no liability upon the principal on the bond; the main object of the appellant was the cancellation of the bond. Fontenot v. Sun Oil Co. was affected by the accessory nature of the overriding royalties involved.
Williams v. City of Baton Rouge, 252 La. 770, 214 So.2d 138 was distinguished in Fontenot v. Sun Oil Co., and characterized as coming "squarely within the general rule that a party cast, who does not appeal, may not benefit by a change in the judgment in favor of or against other parties."
Although the issue in the Williams case (whether the answer to an appeal by one defendant cast as a solidary obligor with another could avail the plaintiff in increasing the plaintiff's award against both, even though plaintiff had answered only one appeal) was different from that before us, it is apparent that the court in Fontenot v. Sun Oil Co. intended only to follow similar cases involving mineral rights.
One case relied on by Mark C. Smith & Sons to give life to its appeal is Department of Highways v. Clemmons, 252 La. 51, 209 So.2d 19 (1968), an unusual case, a departure from a long line of jurisprudence in this State, and one not to be understood to overrule the almost uniform jurisprudence that the appeal bond must be filed within the time allowed for the appeal, in order to prevent the judgment from becoming final. See, Tate, Symposium, 29 La.L.Rev. 269.
In cases involving multiple parties, the Code of Civil Procedure contemplates that judgments against some, but not all parties to a proceeding, may be rendered without waiting for a decision on all issues as to all parties. C.C.P. 1915. To prevent such judgment becoming final, an appeal must be taken and the bond filed within the time fixed by law.
*93 We decline to adopt the rule urged by the Smith interests, that when one solidary obligor perfects an appeal, it inures to the benefit of other solidary obligors.
American Employers Insurance Company urges that the contracts which they bonded were not enforceable against the contractor because the obligations under the contracts were not sufficiently specific to determine with any degree of certainty what the contractor was supposed to build. Among the four requisites necessary to the validity of a contract is, "A certain object, which forms the matter of agreement." C.C. 1779(3).
The contractor agreed in one of the contracts to construct "all streets, water, sanitary sewers, and drainage and lights as to be classified as a first class residential subdivision, commonly referred to in this area as being of Gold Medallion Standards,..." The only other supporting document in existence at the time of the execution of the contract was the preliminary plot plan of the subdivision. There is no other word of explanation in the record, no other drawing and no specifications describing what the contract contemplated. There is no explanation in this contract or in this record to enable us to determine the contractor's obligation under the single word "water." Was it to drill individual wells or construct a system for the whole subdivision? Was the water to come from another source? What size pipe? What kind of pipecast iron, vinyl, or other material? Storage tanks?
A court cannot enforce a contract to construct "sanitary sewers" with no further explanation. What size mains? Does it include a sewage treatment system? Oxidation ponds? Chemical treatment? Where were they to be located?
What kind of "drainage?" Does "lights" mean electric power? Is the electric service to be overhead or underground?
And "all streets?" Asphalt or concrete? Ditches or curb and gutter? Surface drainage or catch basins and storm sewers? What kind and how much base material for the streets? How wide? How thick?
The contract raises more questions than answers.
Nor can the contract be "fleshed out" by the St. Tammany Parish subdivision regulatory ordinance. It covers both asphalt and concrete streets, setting out minimum standards for each, requires only "necessary drainage channels" and "water supply and sewage disposal facilities" acceptable to the health departments.
We agree with the Court of Appeal that the contract for streets and utilities is not enforceable. American Employers' bond is an accessory obligation. (C.C. 1771, 3036), and the defenses of the principal are available to the surety. C.C. 3060.
On the other hand, we find the contract for the renovation and construction of the golf clubhouse, tennis club and pro shop sufficiently specific for enforcement. The blueprints and specifications of the architect Dodds, admittedly of a preliminary nature, are in sufficient detail for a court to enforce, applying, in some cases, the standard of the industry to determine quality.
Nevertheless, the bank (as named co-obligee with Beaurivage in the bond) cannot recover from the surety.[1]
The reason the bank cannot recover from the surety is, as held by the Court of Appeal, it has failed to prove that it was damaged.
*94 The only damage urged before us is the unpaid balance on the $2,100,000 note signed by Beaurivage, Wright, Long and the Smiths. After all credits, including the $1,100,000 bid by the bank when it foreclosed on the land, the bank computes the unpaid balance to be $406,808.50.
But American Employers is surety on the building contracts, not on the notes. The bank's only cause of action against the surety would arise from the fact that the bank was named obligee with Beaurivage in the performance bond written by American Employers to bond Mark C. Smith & Sons' contract to renovate and build the golf club, tennis club and pro shop. By the terms of the bond, American Employers was bound to Beaurivage and City National Bank "jointly as their interest may arise" for $175,000 for the performance of the building contract.
The bank's "interest arises"[2] only if it has been damaged by the failure of Mark C. Smith & Sons to comply with the building contract. The bank's only claim in its petition of intervention is that the contractor's failure rendered the commitment by Guaranty Bond and Finance Company, Inc. for the "take out"[3] unenforceable, and, upon the default of Beaurivage, the bank foreclosed and took a deficiency judgment against Beaurivage. Therefore, claimed the bank, it was entitled to a judgment against the bonding company in the amount of the deficiency judgment.
The bonding company is not liable for the deficiency judgment. It can only be liable for damages for the breach of the building contract.
Nowhere does the bank allege or prove that Beaurivage is insolvent, or has no assets or cannot pay the deficiency judgment, or that any effort has been made to execute the judgment.
The bank's judgment against Beaurivage is an asset. We cannot presume that it is worthless. This the bank must prove.
For these reasons, the judgment of the Court of Appeal is affirmed, at the cost of intervenor, City National Bank of Baton Rouge.
SUMMERS, J., concurs in the result.
CALOGERO, J., concurs in part, dissents in part and assigns written reasons.
BARHAM, J., concurs in part in the holding regarding the effect of the failure to timely appeal, but dissents from the decree in all other respects.
CALOGERO, Justice (concurring in part, dissenting in part).
I concur in that part of the majority opinion denying recovery to The City National Bank of Baton Rouge from American Employers Insurance Company.
I dissent from the affirmance of the judgment against Mark C. Smith & Sons.
While I recognize the well reasoned opinion of the majority is supported by substantial authority I nevertheless find it difficult to award The City National Bank a judgment against the contractor.
It has been determined in this very proceeding that the bank is not legally entitled to recover against the contractor's surety and has in fact suffered no loss. The bank's judgment in the district court was fully protected on appeal by the suspensive appeal bond filed by the surety. In this circumstance I would deny the bank recovery.
NOTES
[1] But not for one reason expressed by the Court of Appeal; its opinion (264 So.2d 304, 312) that the intervention fell with the main demand was in error. C.C.P. 1039.
[2] City National Bank's interest in the $2,100,000 note was only $600,000, the limit to which the federal banking laws allowed it to participate. The Chase Manhattan Bank participated in the loan to the extent of $1,500,000.
[3] Guaranty Bond had agreed, in its commitment for permanent financing, to purchase the $2,100,000 note from the City National Bank after three years and after the subdivision was fully developed.