STOULIG, Judge,
dissenting.
I respectfully dissent.
I conclude there was a meeting of the minds as to the object of the contract. The LoCocos intended to have Harold Keller build an expanded version of the Tolmas Drive house when they signed the agreement of July 8, 1976. The breach came simply because defendants later changed their minds.
If we treat the July 8 agreement as the final document emerging from a series of negotiations, it is readily apparent both buyers and sellers understood what house the LoCocos agreed to have constructed. C.C. art. 1945 requires courts to give legal effect to the intent of the parties in interpreting contracts; and C.C. art. 1949 permits courts to refer to prior or subsequent agreements between the parties to explain doubtful passages in the contract at issue.
To understand the significance of the dealings among the parties prior to July 8, the roles of all the participants must be defined. Vendors Gilbert White and Robert Sullivan owned the residence offered for sale at 3724 Tolmas Drive as well as the Lake Whitney West subdivision. White Properties, Inc. (hereinafter WPI), of which Gilbert White is president, is a real estate broker who was listing agent for Tolmas and the realty here in dispute. Harold Keller (now deceased) was a contractor who built the Tolmas house and who constructed other homes in the Whitney Heights subdivision. Keller had no ownership in either property; had no interest in WPI; but was associated in business with White and Sullivan to the extent that he would pay the vendors one-third of his net profit on a home he constructed as a result of the vendors’ referral.
The business contact here was initiated by Dr. LoCoco through his own realtor, Magner Realty, Inc., when A1 Magner submitted to vendors an offer to buy what LoCoco describes as the “French house” at 3724 Tolmas for $85,500. When the written offer dated July 3, 1976 was accepted July 5, 1976, a cash deposit of $8,550 was given by LoCoco to be escrowed by WPI.
The validity of this contract, which required buyers to forfeit the deposit and pay a real estate commission in the event of a breach, is not disputed; however, it was never put into effect because the LoCocos changed their minds. The house, according to Mrs. LoCoco, was too small. Within the days preceding July 8, Magner and WPI negotiated a second agreement for their clients, which provided it would have the effect of voiding the first written contract, once it was executed.
In the written agreement dated July 8, 1976, the LoCocos stipulated they “* * * agree to purchase Lot 5, Lake Whitney West, Sq. 3, Jefferson Parish and 3500-4000 sq. ft. single family dwelling to be constructed * * * ” from White and Sullivan. They stated value of the ground was $53,500 while the house was to be construct *DLVIII ed for between $90,000 and $95,000. The parties to the contract did not describe the house to be constructed or the period within which it was to be completed; however, the discussions and transaction between the parties prior to July 8 evidence the fact all litigants had a meeting of the mind as to what type of home was to be built.
Even though the builder Keller was not at the July 8 meeting, the LoCocos defined with clarity the house they expected him to build on the lakefront lot. I find it significant that it was Dr. LoCoco who insisted Keller must be the builder, not WPI or the vendors. Important also is Keller’s status as an independent contractor. The following testimony of Dr. LoCoco explains his intent when he induced the vendors to cancel the July 3 contract and substitute the one at issue in its place:
“Q Subsequently, did you execute, on July 8,1976, another purchase agreement?
A Yes, we did.
Q And what was that for?
A It was to rescind the first contract and for me to build a house for 3500 to 4000 square feet for just under a hundred thousand dollars, which was my ceiling price on the construction of the home, so I mortgaged my home and bought the lot out for cash, my present home I’m living in, and with good faith, to build this house for that figure.
It was supposed to be a luxury house comparable to the other house.
Q Did you enter into some discussions with Mr. Keller?
A Yes, many times.
Q Who introduced you?
A We met Mr. Keller through White Properties. He was the builder of other houses, and he told me he built country club homes. He built a lot of homes. I wasn’t familiar with the area, but I liked the workmanship in the French house and I wanted Mr. Keller to build my house. I thought the workmanship was real good in the house. I had worked as a carpenter when I was young and I knew good workmanship, and I thought Mr. Keller did real good work.
Q At any time, Dr. LoCoco, did you consider just making additions to the prior house that you had looked at?
A Yes. We were. The original plan was — I just loved the French house workmanship and all, and we wanted to sit the French house on the lake lot, but we were told it probably wouldn’t look good on the lake because it was such a small house, that a more majestic house, a taller house would look better. The French house is something like a Cape Cod, and it probably would look small on that particular lot.”
We need only look to the testimony of Dr. LoCoco to demonstrate he had a definite object in mind when he signed the July 8 contract and later changed his mind. On cross-examination the doctor candidly conceded this fact. I quote:
“Q All right, sir. And Doctor, is it correct, that the testimony that you gave on direct when you said you met with Mr. Keller and had the discussions about a more majestic house on that site, that was after you had signed the second contract of July 8th?
A Yes.
Q Is it a fair statement that you and your wife at that time changed your minds about building the expanded version of the first house and you wanted a more majestic house?
A Yes.
Q You changed your minds.
A Yes. A taller house. Not more luxurious. We wanted a taller house. We wanted the extra bathroom and — ”
After taking title to the realty on August 19,1976, as the agreement required, defendants conferred on several occasions with Harold Keller, however, in translating what they conceived originally to be a slightly *DLIX larger home of comparable quality into definite plans and specifications, the proposed construction became aggrandized to a point that the extras the LoCocos required added $25,000 to the cost of construction. The additions defendants required were: (1) an extra full bath; (2) additional porches and balconies to take advantage of the view of the lake visible from a higher level over the levee that abutted their lot; (3) eight 2V2 story brick columns; (4) an extra fireplace; (5) stub-outs for a pool to be constructed; (6) a third floor to be prepared for a future bedroom; and (7) several additional appliances and appurtenances.
After several months Harold Keller left a note with one of plaintiffs stating the house would not be built. Before this matter came to trial, Mr. Keller died, thus the specifics of the negotiations are not available to us, at least from his viewpoint. But Dr. and Mrs. LoCoco’s testimony confirms the requirement that the extras enumerated be included in the house. Defendants stated their construction cost ceiling was $95,000 and, understandably, the contractor would not agree to build a $120,000 home for that price.
The trial court concluded defendants breached the contract when they:
“* * * decided, subsequent to the purchase of the lot, that the home they contemplated (within the above stated price range), would not be suitable for the size, shape, location and/or value of their lot. It was obvious from their testimony that they wanted a more prestigious home than the one contemplated under the agreement.”
In written reasons for judgment, after stating the quoted conclusion, the court said it relied heavily on the testimony of John L. Crosby, conceded by all to be an expert builder, who opined the house stipulated in the verbal and written negotiations could have been built within the $90,000 to $95,-000 price range prior to December, 1976 when negotiations with the LoCocos for constructing the house finally terminated unsuccessfully.
I do not agree that the failure to reduce the house conceived by the parties on July 8 into plans and specifications supports the result the “certain object” requisite of C.C. art. 1779 was not met. If the object of a contract is so poorly defined that it cannot be the subject of an order of specific performance, then the object is too indefinite. In Wright v. Mark C. Smith & Sons, 283 So.2d 85 (La.1973), a contract for the construction of a “sanitary sewer” was declared void because the object was too vague. In the instant case, however, the price, the size, the style and the square footage were agreed to by the parties. What remained was to refine the concept into plans and specifications.
Therefore I would affirm the judgment awarding liquidated damages and the brokerage commission. That the vendors and WPI permitted the original $8,550 deposited in escrow with the July 3 agreement to be applied by defendants to the August 1976 purchase of the lot does not void the liquidated damages provision in the contract. As written, even though the contract specifies deposit of earnest money, the intent clearly is to make an amount equivalent to the deposit the damages for breach. That the identical money deposited is not available to satisfy the damage claim and cannot become the sellers of simple forfeiture does not destroy the liquidated damage provision.