522 So.2d 1124 (1988)
CITIZENS BANK & TRUST COMPANY
v.
LITTLE FORD, INC., d/b/a Little Ford, Mercury, Lincoln, Inc.
No. 86 CA 0022.
Court of Appeal of Louisiana, First Circuit.
February 23, 1988.
*1125 Paul M. Hebert, Jr., Baton Rouge, for plaintiff-appellee Citizens Bank & Trust Co.
Mary C. Cali and E. Wade Shows, Baton Rouge, for intervenor: First appellant Ford Motor Credit.
G. Thomas Arbour, Baton Rouge, for defendant-second appellant Little Ford, Mercury-Lincoln, Inc.
Before WATKINS, CARTER and ALFORD, JJ.
WATKINS, Judge.
The primary issue before the court is the ranking of various security instruments between Ford Motor Credit Company (FMCC) and Citizens Bank & Trust Company (Citizens) to certain automobiles sold by Judicial Sale on April 10, 1985. FMCC and Citizens each contend that they are entitled to the proceeds of the sale because each believes it has a superior security interest on the adjudicated vehicles. The second issue is whether the trial court erred in refusing to allow the debtor, Little Ford, Inc., to participate in the proceeding. Little Ford contends, in part, that it is entitled to the proceeds based on the fact that FMCC and Citizens privately sold part of the seized vehicles prior to the judicial sale. For reasons stated below, we find that FMCC is entitled to the proceeds of the sale and that Little Ford was properly denied the right to participate in the proceeding.

FACTS
FMCC and Citizens each held floor plan collateral chattel mortgages covering the inventory of "Little Ford, Inc.", an automobile dealership incorporated on July 21, 1983 in Plaquemine, Louisiana. The corporate name was changed, that same day, to "Little Ford Lincoln Mercury, Inc." and, on October 12, 1983, to "Little Ford Mercury Lincoln, Inc." (Little Ford), as reflected by the Secretary of State's records.
While waiting for approval for a Ford franchise, Little Ford entered into a management contract with an existing Ford dealer, Pizzolato Ford. At that time Pizzolato Ford was on "dealer hold" with Ford Motor Company and was denied financing of new Fords from FMCC. In order to finance the purchase of Ford automobiles, Little Ford entered into a loan agreement with Citizens Bank of Plaquemine, Louisiana. As security for the loans, Little Ford executed a "Floor Plan Collateral Chattel Mortgage on Inventory in Bulk" in favor of Citizens on July 22, 1983. The mortgage secured advances up to $500,000. The documents were executed in the name "Little Ford, Inc.," although the corporate name had been changed the day before to "Little Ford Lincoln Mercury, Inc." The documents were also executed using Pizzolato's dealer number, as Little Ford did not obtain their licensed dealer number until October 21, 1983. At the time the Citizens' mortgage was executed,
*1126 Little Ford was selling only Ford, Lincoln, and Mercury automobiles (Ford products).
The property subject to Citizens' "Floor Plan Collateral Chattel Mortgage" was described in the document as follows:
That certain mass or assemblage of new and/or demonstrator Ford, Lincoln, Mercury motor vehicles of every kind and description, together with all parts, accessories and attachments belonging thereto, constituting Mortgagor's entire revolving stock of inventory, now owned and/or hereinafter acquired by Mortgagor and now located and/or in the future to be located at or in the business sites of Mortgagor listed below, or any of said business sites, or in the process of delivery to this Mortgagor in transit or otherwise, or located at the point of origin or manufacturer, but belonging to Mortgagor or the said inventory of Mortgagor as acquired on and after-acquired property basis.
Mortgagor acknowledges that the property mortgaged herein in bulk is located and/or is to be located at: 2341 Highway 1, South, Plaquemine, Louisiana.
(Emphasis added.)
The document also states that this mortgage shall attach to and shall affect all similar property acquired by Mortgagor (Little Ford), by purchase or otherwise, as part of its inventory and stock-in-trade as provided for under LSA-R.S. 9:5351 et seq. and LSA-R.S. 32:701 et seq. Citizens' Floor Plan Collateral Chattel Mortgage was duly filed with the Commissioner of Vehicles on August 25, 1983, under the name "Little Ford, Linc-Merc, Inc."
Several months later, Little Ford obtained a Chrysler, Dodge, and Plymouth franchise in addition to the Ford franchise. At this time, Little Ford changed its financing arrangements with Citizens and discontinued financing the Ford products through Citizens. Instead, Citizens financed the purchase of Chrysler products, and FMCC financed Little Ford's purchase of Ford products. Citizens did not modify the description of the collateral in its "Floor Plan Collateral Chattel Mortgage," dated July 22, 1983, nor did it seek to have another security instrument executed.
Little Ford did execute a "Floor Plan Chattel Mortgage of Stock of Vehicles, in Bulk" on October 21, 1983, (the same day it became a licensed dealer) in favor of FMCC. The mortgage secured advances up to $1,000,000. The property subject to the mortgage was described in the document as follows:
That certain mass or assemblage of new and used vehicles, now owned or hereafter acquired, the same constituting the entire revolving stock of Inventory of Mortgagor located at its place(s) of business in the State of Louisiana as follows:
(List Each Address at Which Dealer Does Business or Stores Inventory)
Street Address City Parish
2341 Eden Street Plaquemine Iberville
A similar Floor Plan Chattel Mortgage was executed by Little Ford in FMCC's favor on January 7, 1985. This mortgage secured advances up to $2,500,000. Each of these collateral floor plan chattel mortgages reserved FMCC's vendor's privilege[1] with respect to Little Ford's inventory. These floor plan collateral chattel mortgages with FMCC were duly filed with the Commissioner of Vehicles on October 24, 1983 and January 8, 1985, respectively.
On February 8, 1985, Citizens filed a petition for executory process against Little Ford, Inc. Citizens alleged that Little Ford had defaulted on various secured promissory notes and sought the seizure and sale of Little Ford's revolving stock of inventory. After a number of Ford and Chrysler automobiles were seized, FMCC filed a petition for intervention on April 4, 1985. FMCC asserted that its floor plan chattel collateral mortgages and vendor's privilege were superior to the rights of Citizens in the seized automobiles. Some of the seized automobiles were apparently sold at private sales pursuant to an Agreement *1127 for Continuation of Business[2] executed by FMCC and Citizens, and the remainder of the debt was satisfied by vehicles sold at a sheriff's sale on May 1, 1985.
Trial on the intervention was held on May 15, and May 20, 1985. The following facts were established by testimony received at trial. Edward B. Middleton, President and CEO of Citizens, testified that when Little Ford originally contacted the bank concerning the financing of Fords it was because, he stated, "they could not get financing through FMCC because they were not a licensed Ford dealer." Later in his testimony Mr. Middleton appeared to be unaware of the fact that the dealer number which Little Ford used on the Citizens' floor plan transmittal was in fact Pizzolato's dealer number. His testimony also revealed that, as part of the loan and mortgage documentation, Little Ford had warranted that they were in fact a licensed dealer. Mr. Middleton also stated that Citizens was aware of the buy-sell agreement between Little Ford and Pizzolato Ford, but that Citizens was not dealing in any way with Pizzolato Ford. It was also clear from his testimony that Citizens was aware of the fact that FMCC provided the financing of Ford products once Little Ford ceased financing the Fords through Citizens.
It was further established by Michael Little, President of Little Ford, that at the time the Collateral Floor Plan Chattel Mortgage was executed between Citizens and Little Ford, Little Ford intended to use Pizzolato Ford's status as a licensed dealer in order to purchase vehicles and at the same time operate as Little Ford with respect to securing loans for vehicles and the mortgaging thereof.
Clifford Hatley, FMCC Branch Manager, stated that Little Ford's debt to FMCC as of April 30, 1985, was $691,000, consisting of roughly $638,000 in principal and approximately $53,000 in interest. This total included credits due Little Ford from private sales of any mortgaged property.
We also note that Citizens in its petition for executory process claimed an overdue principal balance of $527,920.73 plus accrued interest as of the 1st day of February, 1985, totalling $12,549.94, with interest accruing at a rate of $213.70 per day, as well as 25% for attorney's fees.
Juneest Cox, supervisor of the Floor Plan Mortgage Section of the Office of Motor Vehicles, testified that all floor plan collateral chattel mortgages of motor vehicles are recorded alphabetically in the department's Floor Plan Log Book. She further stated that in order to record a collateral floor plan chattel mortgage the dealer executing the mortgage must be properly licensed by the Commissioner of Motor Vehicles.
The morning of trial Little Ford motioned the court for permission to participate in the trial. The trial court verbally denied to Little Ford the right to participate in the hearing, and, at the conclusion of the hearing, a judgment was rendered on May 20, 1985, being read and signed in original form on June 6, 1985, and in amended form on June 21, 1985. The court held that FMCC, the holder of a vendor's privilege, was entitled to the proceeds from the sheriff's sale of Ford products sold to Little Ford before September 3, 1984 (the effective date of LSA-R.S. 9:5354.1).[3] *1128 However, the court held that Citizens was entitled to the proceeds of all other automobiles, both Ford and Chrysler products, by reason of its prior recorded Floor Plan Collateral Chattel Mortgage. The judgment did not mention the presence of counsel for Little Ford at this hearing, and Little Ford is not noted as a party in the judgment. FMCC appealed suspensively the trial court judgment.
Little Ford filed an answer to the suspensive appeal of FMCC, arguing that the executory process was flawed and that it was entitled to all or, alternatively, a portion of the proceeds of the judicial sale. Citizens filed a motion to dismiss the answer to the appeal of Little Ford, on the ground that Little Ford is not an appellee. We considered the motion to dismiss, and by order dated May 28, 1986, we dismissed Little Ford's answer to appeal and stayed our consideration of the appeal until sixty (60) days from the time that Little Ford obtained a signed judgment of the trial court from which to appeal. Citizens Bank & Tr. Co. v. Little Ford, 506 So.2d 815 (La.App. 1st Cir.1987). Subsequently, Little Ford obtained a signed judgment on June 2, 1987, denying its right to participate in the trial, and thereafter made a timely appeal. The appeal of both FMCC and Little Ford are now before us.
The following issues are set forth by the respective parties.
FMCC's contentions can be summarized as follows. First, Citizens' Floor Plan Collateral Chattel Mortgage is not a valid "Floor Plan Mortgage" and is therefore not entitled to the priority granted by LSA-R. S. 9:5354.1. FMCC argues that only loans made to "licensed" dealers are preferred and that Little Ford was not licensed at the time the loan from Citizens was made. It also argues that the mortgage was invalid because it was executed in the name of "Little Ford, Inc." although at the time the corporate name was purportedly "Little Ford Lincoln Mercury, Inc." FMCC also argues that because the Floor Plan Mortgage was recorded in the name of "Little Ford, Inc." third parties, such as FMCC, searching the public records for mortgages in the name of "Little Ford Lincoln Mercury, Inc." would not be put on notice of the lien. Because the mortgage was not valid against third persons, FMCC reasons, its own vendor's privilege and/or collateral chattel mortgage is superior.
FMCC's second contention is that LSA-R.S. 9:5354.1 may not constitutionally be applied retroactively. FMCC argues that the trial court's application of the statute divests FMCC of a vested right and impairs the contractual obligations due it, in contravention of the United States and Louisiana Constitutions. We note subsequent legislative changes which make this contention moot. See Footnote 3, infra.
*1129 FMCC's third contention is that the language in the Floor Plan Collateral Chattel Mortgage indicates that the mortgage applied only to Ford products in Little Ford's inventory and not to Chrysler products.
Little Ford contends that it should have been permitted to take part in the intervention hearing which culminated in a judgment distributing the proceeds of the sheriff's sale, as Little Ford had a claim to some of the proceeds. Little Ford argues that the writ of seizure was limited in scope to Ford, Lincoln, and Mercury products and that Little Ford is entitled to the proceeds of the sale of Chrysler, Plymouth, Dodge and Dodge trucks, which were unlawfully seized. Alternatively, Little Ford asserts a claim to all of the proceeds of the sheriff's sale based on an agreement between FMCC and Citizens which permitted a portion of Little Ford's inventory to be sold privately without benefit of appraisement.
Little Ford also argues that it is entitled to the return of the proceeds because Citizens failed to prove the amount of debt owed under the mortgage.
Finally, Little Ford also makes a claim for the storage costs of the seized vehicles pending their sale.
We first address the issue of whether Citizens' Floor Plan Collateral Chattel Mortgage is a valid mortgage as against FMCC. As stated above, FMCC presents three arguments as to why the Citizens' mortgage is invalid. One, only loans made to licensed dealers are valid; two, the mortgage was executed in the name of Little Ford when in fact the Secretary of State's records reflect that the name of the corporation was Little Ford Lincoln Mercury, Inc.; and three, the collateral floor plan chattel mortgage was recorded in the name of "Little Ford, Inc." thus not constituting sufficient notice to a third party searching the public records for mortgages in the name of "Little Ford Lincoln Mercury, Inc."
The floor plan collateral chattel mortgages involved in this case are unique security devices which afford the mortgagee security over the mortgagor's entire inventory while at the same time giving the mortgagor flexibility in operating its business. The advantages, to a mortgagee, of taking a floor plan collateral chattel mortgage over a conventional chattel mortgage are that a floor plan collateral chattel mortgage may secure a line of credit with multiple loan advances to the mortgagor and does not require that each item of the mortgaged property be individually identified and described in the mortgage. The mortgagor's security interest may also attach to additional items of inventory which are later acquired, without the necessity of amending the mortgage or executing additional chattel mortgages. Louisiana Floor Plan Mortgage, Edward J. Castaing, Jr., 21 La.Bar J. 119 (1973). The advantage, to a mortgagor, of giving a floor plan collateral chattel mortgage is that, as he sells his inventory to bona fide retail purchasers, the mortgage on that particular item is automatically released.[4]
*1130 The sole and exclusive method of executing and recording floor plan collateral chattel mortgages of automobile dealer inventories is found in Title 32, Section 701 et seq. We turn now to an analysis of the Vehicle Certificate of Title Law beginning with the definitions of "dealer" and "floor plan loan" in section 702.
702(2) "Dealer" shall mean any person engaged in the business of buying, selling or exchanging motor vehicles which are subject to license under Chapter 4 of the Subtitle II of Title 47 of the Louisiana Revised Statutes of 1950....
702(5) The term "floor plan loan" shall mean any loan made to a licensed vehicle dealer and secured by a chattel mortgage on vehicles which constitute a part of the dealer's stock in trade, and which may change in specifics, held for sale in the ordinary course of business.
Section 704 provides the following:
The provisions of this chapter shall apply to the sale and chattel mortgaging of vehicles of the sort and kind required to be registered and licensed under the provisions of Chapter 4 of Subtitle II of Title 47 of the Louisiana Revised Statutes of 1950 and to the chattel mortgaging of vehicles by dealers to secure floor plan loans, except that there is specifically excluded from the provisions of this chapter the sale, but not the chattel mortgaging, of a new vehicle prior to the first sale of such new vehicle to a user, as defined herein.... (Emphasis added)
Section 710 provides in pertinent part as follows:
A.(2)(a) Every chattel mortgage given by a dealer to secure a floor plan loan shall be in writing and the obligations secured thereby shall be described and the exact sum secured thereby shall be stated, or, if the same is to secure future advances, then the maximum amount thereof, shall be stated, and there shall also be stated whether the same be payable on demand or at what fixed or determinable future time.
(b) For the purpose of floor plan loans, it shall be lawful to mortgage in bulk, but changing in specifics, the entire new or used or both motor vehicle inventory of a dealer, even though the same may not be all of a similar nature or kind, and even though the motor vehicles be described as a mass or assemblage of vehicles or as a stock or inventory of vehicles to be sold in the ordinary course of business at a specified place or specified places of business of the dealer in the ordinary course of business.
* * * * * *
B. (2)(a) A floor plan mortgage shall be effective against third persons as of the time it is executed if it is received and such receipt is validated by the secretary of the Department of Public Safety within fifteen days after such date of execution; otherwise, it shall be effective as of the time it is entered in the register of floor plan mortgages by the commissioner or his duly authorized representative.
(b) A mortgage given by a dealer to secure a floor plan loan may be by authentic act, by private act duly authenticated, or by act under private signature.
(c) Every mortgage given by a dealer to secure a floor plan loan by act under private signature shall contain an accurate description of the note or other evidence of indebtedness and need not be paraphed by a notary.
LSA-R.S. 32:718 A., prior to its repeal by La. Acts 1984, No. 773 effective September 1, 1984, provided in part as follows:
A. No person, unless licensed to do so by the commissioner ..., under the provisions of this Chapter, shall carry on or conduct the business of:
* * * * * *
2. ... a dealer in any type of new and unused motor vehicle or motor drawn vehicle for which a dealer's license is not required under R.S. 32:1254.
It is clear from a reading of the Vehicle Certificate of Title Law that the Legislature intended only for licensed dealers to conduct the business of an automobile dealership in Louisiana. Further, support for this interpretation is found in Title 32, Chapter 6, "Distribution and Sale of Motor Vehicles," beginning with the definition of *1131 "motor vehicle dealer" in Section 1252 (14)(a).
1252 (14)(a) "Motor vehicle dealer" means any person, firm, association, corporation, or trust ... who holds a bona fide contract or franchise in effect with a manufacturer or distributor of new or unused motor vehicles, and a license under the provisions of this Chapter or a subsidiary corporation of any such corporation. Such duly franchised and licensed motor vehicle dealers shall be the sole and only persons, firms, associations, corporations, or trusts entitled to sell, publicly solicit, and advertise the sale of new and unused motor vehicles as such.
Furthermore, LSA-R.S. 32:1254 (N) provides that it shall constitute a misdemeanor for any person, firm, association, corporation, or trust to engage in business as, or serve in the capacity of, or act as a motor vehicle dealer in this state without first obtaining a license therefor as provided in this Chapter, regardless of whether or not said person, etc., maintains or has a place or places of business in this state; any person, etc., serving in more than one of said capacities or having more than one place where such business is carried on or conducted shall be required to obtain and hold a current license for each capacity and place of business.
The Distribution and Sale of Motor Vehicles statutes read together with the Vehicle Certificate of Title Law clearly show that the Legislature intended that every dealer be licensed prior to engaging in the business of an automobile dealership in Louisiana. More specifically LSA-R.S. 32:702(5) provides that in order to execute a floor plan loan the dealer must be licensed. This intent is corroborated by the testimony of Juneest Cox of the Department of Motor Vehicles, who stated that while the log sheet of the Department of Motor Vehicles reflects the recording of Citizens' floor plan collateral chattel mortgage, that mortgage should never have been recorded because Little Ford was not a licensed dealer. The evidence clearly established that when Citizens executed and recorded Little Ford's Floor Plan Collateral Chattel Mortgage, Little Ford was not a licensed dealer. Furthermore, the mortgage was executed in the name of "Little Ford, Inc." and recorded in the name of "Little Ford Merc-Linc Inc."
The question now becomes what effect do these legal defects have as to the relative rankings of Citizens' mortgage and FMCC's mortgage. We conclude that these defects do not render the mortgage invalid as between Citizens and Little Ford, due to Little Ford's warranty to Citizens that it was in fact a licensed dealer. However, the defects do render the mortgage invalid as to third parties (FMCC in this case) with properly confected but subsequently recorded mortgages.
The third argument raised by FMCC is whether the description of the chattels mortgaged in Citizens' floor plan collateral chattel mortgage is broad enough to include the Chrysler products. It was clear that the Ford products were mortgaged. We foresee a need to clarify this issue in the event of future proceedings between Citizens and Little Ford. We find the language contained in Citizens' mortgage, together with the testimony adduced at trial concerning the intent of the parties, sufficient to establish that the floor plan collateral chattel mortgage would include both Ford and Chrysler products.
The second issue is whether the trial court erred in refusing Little Ford's motion to participate in the hearing to determine ranking of the mortgages and distribution of the proceeds. As stated above, Little Ford presented the trial court with a motion the morning of the hearing, requesting the following relief:
1) Court fix costs for the storage of the seized property;
2) The amount of the writ was in excess of $50,000 and therefore the court should fix the Sheriff's fee or commission.
3) The court should fix attorney's fees pursuant to Leenerts Farms, Inc. v. Rogers, 421 So.2d 216 (La.1982).
4) All proceeds from the sale of Chrysler, Plymouth, Dodge and Dodge truck motor vehicles should be disbursed to
*1132 Little Ford on the grounds that said vehicles were not subject to the writ of seizure and sale.
5) That all proceeds from the sale of all Ford, Lincoln, and Mercury motor vehicles in excess of $500,000 plus interest, attorney's fees, and Sheriff's fees and costs as fixed by this Court be returned to Little Ford.
Furthermore, in its brief to this court Little Ford for the first time alleged that it was entitled to all of the proceeds of the judicial sale because Citizens and FMCC privately sold some of the automobiles which were under seizure. Little Ford makes this contention based upon the Deficiency Judgment Act. LSA-R.S. 13:4106, 4107.
Citizens contends that defenses and procedural objections to an executory proceeding may be asserted only by an injunction proceeding or by a suspensive appeal from the order directing the issuance of the writ of seizure and sale. Citizens bases its contention upon LSA-C.C.P. art. 2642 which reads in pertinent part as follows:
Defenses and procedural objections to an executory proceeding may be asserted either through an injunction proceeding to arrest the seizure and sale as provided in Articles 2751 through 2754,[[5]] or a suspensive appeal from the order directing the issuance of the writ of seizure and sale, or both.
Little Ford cites the following cases as support for a liberal interpretation of LSA-C.C.P. art. 2642. Gibsland Bank & Trust Co. v. Boddie, 480 So.2d 906 (La.App. 2d Cir.1985); Jambois O. & M. Machine Shop, Inc. v. Dixie Mill Supply Co., 218 So.2d 672 (La.App. 4th Cir.1969).
The court in Boddie noted the use of a permissive "may" in the first paragraph of LSA-C.C.P. art. 2642. Although the court found the article inapplicable to the facts of that particular case, it stated in dicta that:
We are sensitive to the permissive "may" used in this article. LSA-C.C.P. art. 5053. The word implies that other modes that other modes [sic] may be available to assert objections. In Hibernia Homestead & Sav. Assn'n v. Fletcher, 181 So.2d 815 (La.App. 4th Cir.1966), the court permitted a second mortgagee to assert its rights through a summary proceeding, a rule to show cause. LSA-C.C.P. arts. 2592, 2593. However, the second mortgagee in Fletcher filed his rule before the sheriff had distributed the moneys. We agree that other methods may be possible provided they comport with the spirit of article 2642 and *1133 serve to arrest the sale or distribution. Such is not the case here.
Boddie, supra, at 909.
Boddie involved an intervention in an executory proceeding by a creditor which was dismissed due to lack of proof of a mortgage or privilege, therefore the creditor had no proof of any right to intervene pursuant to LSA-C.C.P. art. 2643.
The Jambois case involved an ordinary proceeding in the form of a suit to annul a judicial sale after the judicial sale had taken place. In that case, the property had already been sold by executory process in another suit. The ordinary proceeding sought annulment of the sheriff's sale on the grounds that there was no corporate resolution authorizing the security document and alleging that the form of the instrument used for the collateral document was improper. The court held that the failure of the debtor to take action to enjoin the sale or to appeal from the order of executory process resulted in the sale becoming unassailable as to the debtor. The court did note that certain exceptions existed where there were allegations of fraud or ill practice,[6] however, it found no evidence of such.
Little Ford also cites League Central Credit Union v. Montgomery, 251 La. 971, 207 So.2d 762 (1968), for the proposition that a debtor may attack a judicial sale after the sale is final. The League Central case involved a plaintiff seeking a deficiency judgment after the executory proceeding had taken place. The court held that the debtor was entitled to defend the suit by asserting the invalidity of the judicial sale. League Central, supra, has since been reaffirmed in First Guaranty Bank, Hammond, Louisiana v. Baton Rouge Petroleum Center, Inc., 515 So.2d 802 (La.1987).
We do not question a debtor's right to institute a separate proceeding to annul a judicial sale due to fraud or ill practice or his right to defend a suit for deficiency judgment by alleging defects in the judicial sale. However, neither of these situations is present in the instant case.
Although Little Ford contends that it is not seeking to annul the judicial sale, but rather, merely seeks to have a say in the distribution of the proceeds, we find this argument inconsistent with the facts in this case. It appears to us that in order to grant the majority of relief requested by Little Ford, the trial court would in effect be invalidating the sale.
Under Louisiana law, executory process for seizure and sale of property is an expedited in rem action whereby a creditor may seize and sell property in an ex parte proceeding, without citation and judgment, in order to enforce a mortgage or privilege that is evidenced by an authentic act importing a confession of judgment. LSA-C. C.P. art. 2631. To obtain an ex parte order of seizure and sale, the creditor must file a petition that comports with general pleading requirements and must attach the authentic evidence necessary to prove his right to use executory process. LSA-C. C.P. arts. 2634, 2635. More specifically, LSA-R.S. 13:4103 sets forth the necessary proof requirements when a creditor is seeking executory process against mortgaged property of a corporation. We find from the record that Citizens has complied with the necessary proof requirements in this case.
Once a creditor has properly complied with the requirements of executory process, a debtor is limited in the ways in which he can proceed in defense. "It is well-settled that all defenses and procedural objections to an executory process proceeding are waived if the debtor permits the seizure and sale to proceed without raising any objection by either a suit for injunction or a suspensive appeal. Gibsland Bank & Trust Co. v. Boddie, 480 So.2d 906, 909 (La.App. 2d Cir.1985); Plumbing Supply House v. Century Nat. Bank, 440 So.2d 173, 177 (La.App. 4th Cir. 1983), cert. denied, 444 So.2d 1226 (1984); *1134 also see, Chrysler Credit Corp. v. Brown, 452 So.2d 810, 813-4 (La.App. 3d Cir. 1984)." First Guaranty Bank v. Wells, 509 So.2d 122 (La.App. 1st Cir.1987), writ not considered, 511 So.2d 1146 (La.1987). See also LSA-C.C.P. art. 2642, comment (a).[7]
In the instant case, Little Ford failed to avail itself of the procedural protections which the law provides to debtors in executory proceedings. We therefore find that Little Ford is precluded from participating in the instant executory proceeding.
For the foregoing reasons, we affirm the trial court's denial of Little Ford's motion to participate in this proceeding. We reverse the trial court's ruling as to the proper ranking of the floor plan collateral chattel mortgages as between FMCC and Citizens. We remand this proceeding to the trial court for distribution of the proceeds of the judicial sale in accordance with the views expressed herein.
Costs of this appeal are assessed one-half against Citizens and one-half against Little Ford.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
NOTES
[1] LSA-C.C. art. 3217 provides in pertinent part:

The debts which are privileged on certain movables, are the following:
* * * * * *
6. The price due on movable effects, if they are yet in the possession of the purchaser.
[2] The Continuation of Business Agreement executed by FMCC and Citizens provided that Little Ford "will continue to offer for sale" the mortgaged property and each "will release MSO's [Manufacturer's Statement of Origin] to the vehicles they financed upon receipt of "the net funds from the sale of the vehicle" which is not to be less than the wholesale invoice amount.

They further agreed that each could apply the funds to Little Ford's debt, and upon final judicial determination they will pay over to the other the funds each may have received for each vehicle if the final determination of their respective security interests reveals that the party receiving the funds did not have a first lien or security interest on the particular vehicle sold and Manufacturer's Statement of Origin released therefor.
We further note that although Little Ford was not a party to this written agreement, they continued to sell vehicles from their dealership and forward the funds to the mortgagee who had financed the sold vehicles.
[3] LSA-R.S. 9:5354.1 provides:

Notwithstanding any other law to the contrary, a recorded notice of a security interest of a collateral mortgage created pursuant to R.S. 9:5351 as security for the financing, in whole or in part, of any masses or assemblages of things, stocks of merchandise, or other things in bulk, but changing in specifics including inventory whether the inventory is held for resale, raw material, work in process, or material used or otherwise consumed in the process of assembling or manufacturing a finished product, held for sale or lease or otherwise; or created as security for the financing, in whole or in part, of motor vehicle floor plan loans pursuant to R.S. 32:710, shall be superior in rank to a vendor's privilege that originates from a sale to the mortgagor, other than a bona fide retail purchaser, when the sale takes place after the time the collateral chattel mortgage is recorded.
Section 2 of Acts 1987, No. 701, provides:
All collateral chattel mortgages and chattel mortgages filed prior to the effective date of this Act shall maintain their rank and effect as to third parties as provided for by the law in effect prior to the effective date of this Act. [September 1, 1987]
We also note a recent change in the Vehicle Certificate of Title Law, Section 32:710N.(1), which would allow an inferior chattel mortgage holder to obtain a superior rank upon notification to the superior chattel mortgage holder that the dealer has executed a chattel mortgage on specifically identifiable motor vehicles or mass or assemblage of motor vehicles and such chattel mortgage is properly executed and recorded. Such inferior mortgage shall be superior in ranking as to the motor vehicles or property the dealer receives possession of after execution and recordation of such chattel mortgage on which the holder sells or advances funds for the purchase thereof.
[4] LSA-R.S. 32:710 C. provides as follows:

The holders of mortgages on motor vehicles, who expressly or impliedly consent to such vehicles being placed on sale by the owners thereof in the State of Louisiana in the ordinary course of business shall be precluded from asserting the said floor plan mortgage or the lien created by it against bona fide retail purchasers in actual good faith of said vehicles. Holders of such mortgages shall be deemed to have impliedly consented to sales of the mortgaged property free and clear of such mortgages to bona fide retail purchasers in actual good faith whenever the mortgagor is a dealer duly licensed to sell the type of vehicles covered by the floor plan mortgage. Such consent may not be negated or withheld by any express provision in the mortgage when the mortgagor holds such an occupational license. For purposes of this section, a bona fide retail purchaser in actual good faith shall be deemed to be any person, firm, partnership or corporation purchasing a vehicle, for individual or business use and not for resale from a licensed dealer, who does not in fact know of a mortgage existing on the property purchased; provided, however, that the holders of mortgages on vehicles who expressly or impliedly consent to such vehicles being placed on sale by the owner thereof in the ordinary course of business shall not be precluded from asserting said mortgage or the lien created by it against group or bulk purchases whether said purchase is in good faith or not. (Emphasis added)
[5] LSA-C.C.P. art. 2751 provides as follows:

The defendant in the executory proceeding may arrest the seizure and sale of the property by injunction when the debt secured by the mortgage or privilege is extinguished, or is legally unenforceable, or if the procedure required by law for an executory proceeding has not been followed.
In the event injunctive relief is granted to the defendant, if the court finds the seizure in the executory proceeding to be wrongful, it may allow damages to the defendant. Attorney's fees for the services rendered in connection with the injunction may be included as an element of the damages.
LSA-C.C.P. art. 2753 provides as follows:
A. The original debtor, his surviving spouse in community, heirs, legatees, and legal representative are not required to furnish security for the issuance of a temporary restraining order or preliminary injunction to arrest a seizure and sale, when the injunctive relief is applied for solely on one or more of the following grounds:
(1) The debt secured by the mortgage or privilege is extinguished or prescribed;
(2) The enforcement of the debt secured by the mortgage or privilege is premature, either because the original term allowed for payment, or any extension thereof granted by the creditor, had not expired at the time of the institution of the executory proceeding;
(3) The act evidencing the mortgage or privilege is forged, or the debtor's signature thereto was procured by fraud, violence, or other unlawful means;
(4) The defendant in the executory proceeding has a liquidated claim to plead in compensation against the debt secured by the mortgage or privilege; or
(5) The order directing the issuance of the writ of seizure and sale was rendered without sufficient authentic evidence having been submitted to the court, or the evidence submitted was not actually authentic.
B. Notwithstanding any of the provisions of this Chapter to the contrary, a claim or an action in redhibition shall not be grounds for the issuance of a temporary restraining order or preliminary injunction to arrest a seizure and sale, without security as provided by law.
[6] Little Ford does not contend that fraud or ill practice is involved in this case so we will not address that issue.
[7] Comment (a) of LSA-C.C.P. art. 2642 provides:

The whole theory on which the civilian executory proceeding rests is that a seizure of the property subject to the mortgage or privilege may be made immediately on the order of the court issued on the ex parte application of the creditor. It is not a contradictory proceeding at all; but an ex parte one. The defendant can assert any valid defenses to the seizure, but he must do so either through an opposition to arrest the seizure and sale, or through an appeal from the order directing the seizure and sale. (Citations omitted) (Emphasis added).