595 So.2d 346 (1992)
GENERAL MOTORS ACCEPTANCE CORPORATION, Plaintiff,
v.
CRAIN CHEVROLET-OLDS-PONTIAC, INC., et al., Defendant.
No. 23335-CA.
Court of Appeal of Louisiana, Second Circuit.
February 26, 1992.
Rehearing Denied April 2, 1992.
Cotton, Bolton, Hoychick & Doughty by Terry A. Doughty, for defendant intervenor First Republic Bank.
Burnett, Walker & Baker by Glenn E. Walker, for plaintiff General Motors Acceptance Corp.
*347 Before LINDSAY, HIGHTOWER and VICTORY, JJ.
LINDSAY, Judge.
This case involves a ranking of chattel mortgages on two Chevrolet Beretta automobiles. Suit was originally filed by plaintiff, General Motors Acceptance Corporation (GMAC), against Crain Chevrolet-Olds-Pontiac, Inc. (Crain Chevrolet) and Willie and Dorothy Crain for a money judgment and recognition of its floor plan chattel mortgage on various vehicles, including the two Beretta automobiles. Intervenor, First Republic Bank, intervened seeking recognition of its collateral chattel mortgages on the two automobiles. The trial court rendered judgment ranking the GMAC floor plan mortgage ahead of the mortgages of First Republic Bank. First Republic Bank appealed. For the reasons assigned below, we affirm the judgment of the trial court.

FACTS
Crain Chevrolet was a new car General Motors dealer in Rayville, Louisiana. All of its corporate stock was owned by Willie E. and Dorothy F. Crain, who also served, respectively, as president and secretary.
Crain-Roberts Leasing Co., Inc., was a vehicle leasing company that purchased new and used vehicles to rent. Its corporate domicile was Monroe, Ouachita Parish. Fifty percent of its stock was owned by Willie E. and Dorothy F. Crain, while the other fifty percent was owned by Ralph E. and Jeanne Roberts. All four stockholders served as corporate officers.
In 1985, GMAC entered into a wholesale "floor plan" financing agreement with Crain Chevrolet in which GMAC financed the purchase of Crain Chevrolet's new vehicle inventory. As part of the floor plan financing agreement, Crain Chevrolet executed a $3,000,000 collateral chattel mortgage note dated April 17, 1985. The chattel mortgage, which secured payment of the note, was duly recorded with the Department of Public Safety, Motor Vehicle Division, on June 3, 1985. In 1987, GMAC entered into another floor plan agreement with Crain Chevrolet. This agreement was evidenced by a $3,000,000 collateral chattel mortgage note and chattel mortgage dated March 13, 1987. The chattel mortgage was registered with the Motor Vehicle Division on April 2, 1987.
The two cars at issue in this case, a 1988 Chevrolet Beretta and a 1989 Chevrolet Beretta, were among the cars acquired by Crain Chevrolet from the manufacturer through the financing provided under these agreements. The terms of the agreements required Crain Chevrolet to pay GMAC immediately upon the sale of the cars. However, as pointed out below, GMAC never received payment for the Berettas.
On February 20, 1989, Mr. Crain informed GMAC that Crain Chevrolet was closing. GMAC representatives immediately began an inventory of the vehicles in the possession of Crain Chevrolet. The inventory revealed that the two Berettas, for which GMAC had not been paid, were among the vehicles not on the lot. A partial dation en paiement was executed by the Crains on February 23, 1989, transferring to GMAC all of the remaining new car inventory, which was then physically removed from the property.
However, during the week of February 12, 1989, ten cars, including the two Berettas at issue, had been delivered from the Crain Chevrolet lot to the premises of Crain-Roberts Leasing, Inc. Of these cars, ultimately Crain-Roberts only kept the two Berettas and one other car. At the time the cars were delivered to Crain-Roberts, no payment was made nor had financing for their purchase been arranged.
On February 17, 1989, First Republic was contacted by Mr. Crain. Mr. Crain advised that Crain-Roberts was purchasing the Berettas which had been delivered by Crain Chevrolet. Mr. Crain asked if First Republic would finance the two vehicles. The bank agreed. Thereafter, Crain-Roberts executed collateral mortgages in favor of First Republic covering the Berettas. The financial arrangements were concluded on February 22, 1989. (First Republic had no knowledge of the floor plan mortgage agreement between GMAC and Crain Chevrolet, *348 or of Crain Chevrolet's financial problems.) First Republic issued two cashiers checks in the amounts agreed upon and received the manufacturer's certificates of origin (MCO's) on the cars. Upon obtaining the MCO's, First Republic duly recorded its mortgages with the Office of Motor Vehicles. Certificates of title were issued listing First Republic as first mortgagee.
On April 19, 1989, GMAC filed suit against the Crains and Crain Chevrolet, seeking a money judgment, sequestration of various vehicles, including the two Berettas, and garnishment of certain funds. GMAC also sought recognition of its floor plan mortgages. The Berettas were seized but released to Crain-Roberts as keeper. Subsequently, when Crain-Roberts was unable to pay First Republic on its notes, the vehicles were surrendered to the Ouachita Parish sheriff who took possession of them under GMAC's writ of sequestration.
In May, 1989, Crain Chevrolet was placed in Chapter 7 bankruptcy proceedings. The district court proceedings were transferred to the bankruptcy court, but the bankruptcy trustee later abandoned the two Berettas, and the matter was remanded to the Fourth Judicial District Court. In November, 1989, Crain-Roberts was placed in Chapter 11 bankruptcy proceedings. In March, 1990, Mr. and Mrs. Crain filed for Chapter 13 bankruptcy protection, but those proceedings were converted to Chapter 7 bankruptcy proceedings in June, 1990.
First Republic intervened in the GMAC suit. Thereafter, a hearing was held on First Republic's rule to rank its mortgages and the GMAC floor plan mortgages. Testimony was presented by Mr. Crain, Mr. Roberts, and Timmie Thames, a vice president of First Republic.
Following the hearing, the trial court issued its written reasons for judgment. In its opinion, the trial court stated that in order for the floor plan mortgage to be released or subordinated under LSA-R.S. 32:710(C), the sale of the cars had to be accomplished "in the ordinary course of business" and to a purchaser who was acting in actual good faith and purchasing the vehicles for "individual or business use and not for resale" and who did not know of GMAC's mortgage. The court found that there was an actual sale by Crain Chevrolet to Crain-Roberts and that the vehicles were used by Crain-Roberts for personal and business purposes. However, it found that if the sale occurred on February 22, 1989, or even a few days earlier, then the sale was not "in the ordinary course of business" inasmuch as Crain Chevrolet had closed its doors on February 20, 1989.
More importantly, the trial court found that Crain-Roberts was not a bona fide retail purchaser in actual good faith which did not know of GMAC's floor plan mortgage. In support of this finding, the court pointed to Mr. Roberts' former position as a banker in an automobile loan department who was fully aware of floor plan mortgages. While Mr. Roberts had no reason to know the specifics of Crain Chevrolet's floor plan financing, the court found that he was aware of Crain Chevrolet's financial difficulties. Also, Mr. Crain, who obviously knew of Crain Chevrolet's financial situation, was also acting for Crain-Roberts when he arranged the financing with First Republic.
The trial court disagreed with First Republic's argument that, as the holder of chattel mortgages on the two Berettas, it should be considered the "purchaser" in the context of this case. Consequently, the court sustained GMAC's position as the first mortgagee.
First Republic appealed.

FLOOR PLAN MORTGAGES
A floor plan collateral chattel mortgage is a unique security device which affords the mortgagee security over the mortgagor's entire inventory while at the same time giving the mortgagor flexibility in operating its business. Louisiana Floor Plan Mortgage, Edward J. Castaing, Jr., 21 La.Bar J. 119 (1973); Citizens Bank & Trust Company v. Little Ford, Inc., 522 So.2d 1124 (La.App. 1st Cir.1988). A floor plan loan is defined in Title 32 of the Louisiana Revised Statutes as any loan made to a licensed vehicle dealer and secured by a chattel mortgage entered into prior to the *349 effective date (January 1, 1990) of Chapter 9 of the Louisiana Commercial Laws (LSA-R.S. 10:9-101, et seq.). The mortgage covers vehicles constituting a part of the dealer's stock in trade, which may change in specifics, held for sale in the ordinary course of business. LSA-R.S. 32:702(5).
LSA-R.S. 32:710(C) provides:

The holders of mortgages on motor vehicles, who expressly or impliedly consent to such vehicles being placed on sale by the owners thereof in the State of Louisiana in the ordinary course of business shall be precluded from asserting the said floor plan mortgage or the lien created by it against bona fide retail purchasers in actual good faith of said vehicles. Holders of such mortgages shall be deemed to have impliedly consented to sales of the mortgaged property free and clear of such mortgages to bona fide retail purchasers in actual good faith whenever the mortgagor is a dealer duly licensed to sell the type of vehicles covered by the floor plan mortgage. Such consent may not be negated or withheld by any express provision in the mortgage when the mortgagor holds such an occupational license. For purposes of this section, a bona fide retail purchaser in actual good faith shall be deemed to be any person, firm, partnership or corporation purchasing a vehicle, for individual or business use and not for resale from a licensed dealer, who does not in fact know of a mortgage existing on the property purchased; provided, however, that the holders of mortgages on vehicles who expressly or impliedly consent to such vehicles being placed on sale by the owner thereof in the ordinary course of business shall not be precluded from asserting said mortgage or the lien created by it against group or bulk purchases whether said purchase is in good faith or not.
(Emphasis ours.)
The floor plan collateral chattel mortgages executed by GMAC and Crain Chevrolet contained the following relevant provisions:
3. To secure the payment of the Note, in principal and interest, together with all attorneys' fees stipulated therein as well as any obligations of whatever kind or nature, however evidenced, whether now due or to become due that may be secured by the pledge of the Note, ... and the performance by Dealer of all obligations undertaken by Dealer herein, Dealer hereby specifically mortgages, affects, and hypothecates in favor of GM or any future holder of the Note Dealer's entire inventory of new cars, trucks and chassis purchased from GM, which may change in specifics, held for sale in the ordinary course of business whether now owned or hereafter acquired by Dealer all of which is now or hereafter located at the places of business of Dealer hereinabove stated (hereinafter the "subject Merchandise") and, until so sold, shall remain so specifically mortgaged and hypothecated until payment in full of the Note and any of the obligations secured by the pledge thereof.
. . . .
7. Dealer may sell the subject Merchandise in the ordinary course of business; provided, however, that any and all proceeds thereof shall be fully, faithfully and promptly accounted for by Dealer to the extent of the obligations hereby secured.
(Emphasis ours)
The obvious advantage to the mortgagor under a floor plan mortgage is that, as he sells his inventory to bona fide retail purchasers, the mortgage on that particular item is automatically released.
However, in order for the mortgage to be released, there must be compliance with the abovementioned provisions. There must be an actual sale to a bona fide retail purchaser in actual good faith purchasing the vehicle for individual or business use (not for resale) who does not in fact know of the mortgage existing on the purchased property. The sale must occur in the ordinary course of business.
The trial court accepted the testimony of Mr. Roberts and Mr. Crain that the two *350 Berettas were the subject of actual, not fictitious, sales. As previously noted, however, the court also found that the sales had not been made "in the ordinary course of business" because the sales were executed after Crain Chevrolet shut down. Based upon our review of the record and in view of the trial court's factual findings, we find no error in the trial court's conclusions on these issues.

BONA FIDE PURCHASER IN GOOD FAITH
Republic Bank further asserts that the trial court erred in holding that Crain-Roberts was not a bona fide purchaser in good faith who did not know of the floor plan mortgages on the Berettas.
Generally, the knowledge of an officer of a corporation, obtained in the conduct of its business, is imputable to the corporation. Wright v. Mark C. Smith & Sons Partnership, 264 So.2d 304 (La.App. 1st Cir.1972), affirmed 283 So.2d 85 (La. 1973). Where there are dealings between two corporations, through the intervention of a common officer, the question of whether the corporation is to be charged with notice of what is known to the agent by virtue of his relation to the other corporation depends on the circumstances of each case. 19 C.J.S. Corporations § 637, at 287 (1990); 18B Am.Jur.2d Corporations § 1683, at 533 (1985).
Mr. Roberts, the president of Crain-Roberts, was an experienced former loan officer who testified that he had assumed that there was a floor plan mortgage on the Crain Chevrolet vehicles but that he did not know any specific details. However, Mr. Crain, the president of Crain Chevrolet and the vice president of Crain-Roberts, was fully aware of the existence of the floor plan mortgages involving Crain Chevrolet. Mr. Crain's actions in arranging the financing in the Beretta sales were apparently taken on behalf of both corporations. (He and his son, Gene Crain, personally guaranteed the First Republic mortgages.) Also, there was a very close, ongoing relationship between the two companies as shown by a series of fictitious car sales conducted between the companies by Mr. Roberts and Mr. Crain over a period of several months in order to briefly improve Crain Chevrolet's financial condition. Also, Mr. Crain had borrowed money from Crain-Roberts in order to improve Crain Chevrolet's "cash flow" problems, a fact of which Mr. Roberts was fully aware.
Under the circumstances of this case, we find that at least Mr. Crain's knowledge of the floor plan mortgages must be imputed to Crain-Roberts. Consequently, we agree with the trial court that Crain-Roberts cannot be considered a bona fide purchaser in good faith without knowledge of the floor plan mortgage.[1]
Also, we cannot find that Republic Bank is entitled to be considered as such a purchaser in the place of Crain-Roberts. In order to do so, we would have to use certain U.C.C. definitions which are clearly inapplicable to the present situation. We cannot utilize the definitions of "purchase" or "purchaser" found in LSA-R.S. 10:1-201(32) and (33) where LSA-R.S. 32:710(C) provides its own definition for a "bona fide retail purchaser in actual good faith." Nor is it appropriate to resort to equity in this case where the positive law provides a remedy. LSA-C.C. Art. 4.
To determine whether GMAC's floor plan mortgage on the two Berettas was released, we must examine the relationship between the seller (Crain Chevrolet) and the buyer (Crain-Roberts). Like the trial court, we find that the floor plan mortgage was not released.
This assignment of error has no merit.

CONCLUSION
The judgment of the trial court is affirmed. Costs are assessed against the appellant-intervenor.
AFFIRMED.

*351 APPLICATION FOR REHEARING
Before NORRIS, LINDSAY, HIGHTOWER, VICTORY and BROWN, JJ.
Rehearing denied.
NOTES
[1] GMAC also contends that, since the sale of the Berettas initially involved a total of ten cars of which three were ultimately purchased, there was a group or bulk sale. Thus, under LSA-R.S. 32:710(C), the good faith of the buyer would not be an issue. However, due to our disposition of this case, we pretermit consideration of this argument.